[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-14359

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 9, 2010
JOHN LEY
CLERK

D.C. Docket No. 08-20198-CV-CMA

WORLD HOLDINGS, LLC,
a Florida Limited Liability Company,

Plaintiff-Appellee,

versus

THE FEDERAL REPUBLIC OF GERMANY,
a foreign state,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 9, 2010)

Before CARNES, ANDERSON and STAHL,* Circuit Judges.

_____

* Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by
designation.

STAHL, Circuit Judge:

This case arises from efforts by Plaintiff-Appellee, World Holdings, LLC ("World Holdings"), to obtain payment on certain bonds issued by Appellant, the Federal Republic of Germany ("Germany"). Germany now appeals the denial of its motion to dismiss for lack of subject matter jurisdiction. After a careful review, we affirm.

## I. Facts and Background[1]

In 1924, Germany offered for subscription in the United States $110 million of bearer bonds, called "Dawes Bonds," which were listed on the New York Stock Exchange and payable in U.S. gold dollars in New York City at the offering fiscal agent in the United States. In 1930, Germany offered for subscription in the United States $98.25 million of a second type of bearer bond, called "Young Bonds." The Young Bonds were also listed on the New York Stock Exchange and payable in New York City.

Both the Dawes Bonds and the Young Bonds were backed by the full faith and credit of Germany and required Germany to maintain sinking funds from

---

[1]As when reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff and accept all well-pled facts alleged in the complaint as true. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009).

various revenue sources. According to World Holdings, Germany discontinued payments to the sinking funds in June 1933. By July 1934, Germany had ceased making interest payments on both the Young Bonds and the Dawes Bonds. Though Germany was in default of its obligations under the Bonds, the outbreak of World War II made impossible any demands for payment or pursuit of remedies under the Bonds.

Following the war, Germany affirmed its pre-war liabilities, including the Dawes and Young Bonds. A payment plan was negotiated at the Conference on German External Debts in London, and on February 27, 1953, Germany, the United States, and seventeen other nations signed the London Debt Agreement ("LDA"),[2] which resulted in a proposed settlement of most of Germany's pre-World War II debts, including the Bonds.[3] Also in 1953, a series of measures were enacted relating to the London Debt Agreement. One of those measures is the Agreement Between the United States of America and the Federal Republic of

---

[2]Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443. World Holdings states that the United States and Germany signed the LDA along with fifteen other nations, but we take judicial notice of the statement in the LDA's preamble that seventeen other nations signed the Agreement. Id., pmbl., para. 1.

[3]According to World Holdings, bondholders could decline to accept the offer of settlement under the London Debt Agreement. World Holdings admits, and Germany agrees, that World Holdings did not accept the terms of the LDA. According to World Holdings, the LDA does not provide clear treatment for non-accepting bondholders like itself.

Germany Regarding Certain Matters Arising from the Validation of German Dollar Bonds (the "1953 Treaty"), Apr. 1, 1953, 4 U.S.T. 885.

In the 1953 Treaty, the United States and Germany "agreed that it is in their common interest to provide for the determination of the validity of German dollar bonds in view of the possibility that a large number of such bonds may have been unlawfully acquired during hostilities in Germany or soon thereafter." 4 U.S.T. 885, pmbl., para. 2. Another agreement signed in conjunction with the LDA, the Agreement Between the Government of the United States of America and the Government of the Federal Republic of Germany Regarding the Validation of Dollar Bonds of German Issue (the "Agreement on Validation Procedures"), Feb. 27, 1953, 4 U.S.T. 797, provided the procedures by which a bondholder might validate his bonds. The 1953 Treaty explicitly references the Agreement on Validation Procedures and provides:

> No bond, coupon, dividend warrant, renewal certificate, subscription warrant or other secondary instrument . . . shall be enforceable unless and until it shall be validated either by the Board for the Validation of German Bonds in the United States established by the Agreement on Validation Procedures, or by the authorities competent for that purpose in the Federal Republic.

4 U.S.T. 885, art. II.

In order for a bondholder to satisfy the validation requirement of the 1953 Treaty, he must show, by reference to evidence, that his Bonds were held outside Germany on January 1, 1945.  According to World Holdings, the validation requirement came about due to a "stolen bond theory," as described in Abrey v. Reusch, 153 F. Supp. 337 (S.D.N.Y. 1957):

> After the First World War, and principally between 1924 and 1930, a large number of bearer Dollar Bonds were sold by German enterprises. . . . Prior to the outbreak of the Second World War, many of these Dollar Bonds had been repurchased and reacquired by the issuers for eventual retirement, and later submitted to meet sinking fund and amortization requirements.  Such reacquired bonds were retained in Germany and no longer represented valid obligations.
> During the Second World War, it was impossible to present such bonds to the American trustees or paying agents for cancellation.  As a consequence, large numbers of these uncancelled bearer Dollar Bonds, in negotiable form, were held in the vaults of German banks.
> After the surrender of Germany, Russian occupation forces seized the uncancelled, negotiable Dollar Bonds which they found in the German bank vaults within the area of their control.  The face amount of such bonds has been estimated at $350,000,000.  These looted bonds were returned to circulation by the Russians.
> At the same time, other German Dollar Bonds, amounting to about $250,000,000, were in the legitimate possession of their bona fide purchasers.  There was thus a real possibility that the eventual holders of the looted bonds would share the available assets (limited available foreign exchange) of the German obligors equally with the legitimate bondholders, a large number of whom were nationals of the United States.  Moreover, the free and open trading in the United States of all German Dollar Bonds was impeded by the uncertainties arising from the situation described above.

Id. at 339.

World Holdings currently owns or controls a significant number of Dawes and Young Bonds in the original principal amount of $1,000 and $100 denominations.  In December 2007, World Holdings demanded payment of its Bonds in a letter sent to Angela Merkel, Chancellor of Germany, and several ministers of Germany; Germany did not respond.

Germany has maintained that the Bonds must be submitted for validation before they can be paid.  World Holdings states that no Validation Board is currently in existence.[4]  World Holdings further claims that it is not subject to the validation requirement.[5]

World Holdings filed this action on January 23, 2008.  In its Amended Complaint, World Holdings charges Germany with breach of contract based on Germany's alleged default of its obligation to pay the outstanding principal and accrued interest on World Holdings' Dawes and Young Bonds.

Germany moved to dismiss for lack of subject matter jurisdiction on the ground that World Holdings' failure to register its bonds and submit them for validation is fatal to its claims.  Specifically, Germany argued that the 1953 Treaty

---

[4]Germany, for its part, maintains that such an authority (the "Examining Authority") has existed in Germany without interruption since 1952 and that World Holdings has not contacted the Examining Authority with any request to validate its bonds.

[5]World Holdings has argued below that those who did not accept the terms of the LDA need not validate their bonds.

precluded an enforcement action in United States courts on bonds that have not been validated.

The district court denied the motion, finding that it had subject matter jurisdiction over the action under the commercial-activity exception to the Foreign Sovereign Immunities Act ("FSIA" or the "Act"), 28 U.S.C. § 1602, et seq. This appeal followed.[6]

## II. Analysis

A.

We review de novo the district court's decision to deny the motion to dismiss for lack of subject matter jurisdiction. Sinaltrainal, 578 F.3d at 1260.

B.

The FSIA, enacted in 1976, years after the 1953 Treaty, "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610 (1992). Under the Act, a foreign state "shall be

---

[6]We have jurisdiction to hear the appeal. "It is well-settled that a court of appeals has jurisdiction over interlocutory orders denying claims of immunity under the FSIA." Butler v. Sukhoi Co., 579 F.3d 1307, 1311 (11th Cir. 2009) (citing O'Bryan v. Holy See, 556 F.3d 361, 372 (6th Cir. 2009)). Germany argued below that it is, in effect, immune from suit under the FSIA and the 1953 Treaty, as the Act is subject to the terms of the 1953 Treaty. Thus, we have jurisdiction over Germany's assertion of sovereign immunity under the 1953 Treaty (pursuant to the FSIA's "treaty exception") despite the lack of a final judgment in this case. Id.

immune from the jurisdiction of the courts of the United States and of the States" unless one of several statutorily defined exceptions applies. Id. at 610-11 (emphasis in original). As the Supreme Court has held, "the FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in our courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).

Among the FSIA's exceptions to immunity is the commercial-activity exception of section 1605(a)(2), which provides that a foreign state shall not be immune from suit in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Germany concedes that its issuance and sale of bonds in the United States brings it within the commercial-activity exception to the FSIA's grant of immunity.

Despite the application of this exception, Germany argues that it is nonetheless immune from suit. The FSIA was adopted "[s]ubject to existing international agreements to which the United States [was] a party at the time of

[the FSIA's] enactment." 28 U.S.C. § 1604.[7] The "subject to" clause, to which we will refer as the "treaty exception," "applies when international agreements 'expressly conflic[t]' with the immunity provisions of the FSIA." Amerada Hess, 488 U.S. at 442 (quoting H.R. Rep. No. 94-1487, at 17 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6616) (alteration in original).[8] If there is an express conflict between the FSIA and such an agreement regarding the amenability of a contracting state to suit in the United States courts, the international agreement prevails. See Moore v. United Kingdom, 384 F.3d 1079, 1085 (9th Cir. 2004); see also H.R. Rep. No. 94-1487, at 17.

---

[7]The full text of section 1604 provides:
Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.
28 U.S.C. § 1604.

[8]We need not decide whether the "subject to" language applies only to abrogate immunity where it may otherwise exist under the FSIA, or whether an existing international agreement may alternatively preserve a foreign sovereign's immunity from the jurisdiction of United States courts where the foreign sovereign's conduct otherwise falls under an exception to immunity in the FSIA. See World Holdings, LLC v. Federal Republic of Germany, 08-cv-20198-CMA, Dkt. # 139, at 10 n.11. For the purposes of this case, we presume that it may, because even assuming that the commercial-activity exception of section 1605 is "subject to" existing international agreements, the 1953 Treaty does not expressly conflict with the commercial-activity exception, and thus does not preserve Germany's immunity here.

9

The international agreement to which Germany points is the 1953 Treaty, adopted many years prior to the enactment of the FSIA. Article II of the treaty states:

> No bond, coupon, dividend warrant, renewal certificate, subscription warrant or other secondary instrument referred to in the first sentence of Article I above shall be enforceable unless and until it shall be validated either by the Board for the Validation of German Bonds in the United States established by the Agreement on Validation Procedures, or by the authorities competent for that purpose in the Federal Republic.

4 U.S.T. 885, art. II (emphasis added). Our task is to determine whether the 1953 Treaty expressly conflicts with the immunity provisions of the FSIA, specifically, the commercial-activity exception which serves to abrogate Germany's immunity.

In so doing, we look to Amerada Hess for guidance. We note at the outset that Amerada Hess presented a slightly different question than this case. There, the Court had found that none of the exceptions enumerated in section 1605 applied to abrogate Argentina's sovereign immunity. Amerada Hess, 488 U.S. at 439. Thus, when considering the treaty exception, the Court was evaluating the plaintiff's claim that the "subject to" language extended jurisdiction where it otherwise did not exist. In finding that it did not, the Court explained that the treaties at issue did not "create private rights of action for foreign corporations to recover compensation from foreign states in United States courts." Id. at 442.

10

Rather, they "only set forth substantive rules of conduct and state[d] that compensation shall be paid for certain wrongs." Id. In other words, the treaties at issue did not expressly conflict with the FSIA because they did not speak to the issue of sovereign immunity.

Here, as the district court found, Article II is silent on the question of immunity. Germany would have us read Article II to say that "a plaintiff cannot bring an action in the courts of the United States to enforce its rights under its bonds unless and until it has validated its bonds," but that meaning is not apparent from the language of the treaty.[9] Though Article II states that no bond "shall be enforceable unless and until it shall be validated," that does not necessarily mean that a plaintiff may not <u>bring a legal action</u> in the United States courts to seek enforcement of a bond that has not been validated. In the absence of such an express conflict, we find that the "treaty exception" does not apply.

---

[9]Interestingly, the Second Circuit in a very recent opinion rejected Germany's argument that the commercial-activity exception would not abrogate its immunity when the plaintiff bondholder had failed to comply with the LDA's validation procedures. The court stated:

> We are unpersuaded that non-compliance with the validation procedures undermines the applicability of the commercial activity exception to the FSIA. The issue of whether [the plaintiff] complied with the validation procedures does not touch upon any of the requirements of the commercial activity exception, which is concerned with the conduct of the foreign state and not the allegedly aggrieved party. . . . Taking up the validation issue at the jurisdictional stage would thus be premature.

<u>Mortimer Off Shore Services, Ltd. v. Federal Republic of Germany</u>, --- F.3d ----, 2010 WL 2891069, at *9 (2d Cir. Jul. 26, 2010).

Germany also points us to the Preamble of the 1953 Treaty,[10] which states, in part:

> [T]he United States and the Federal Republic agree that further measures are required to permit debtors and creditors to proceed to the orderly settlement of the obligations arising from German dollar bonds with confidence in the stability of the procedures regarding validation and with assurance that <u>claims prejudicial to such settlement will not be asserted on the basis of bonds which were unlawfully acquired.</u>

4 U.S.T. 885, pmbl., para. 5 (emphasis added). While this portion of the preamble amplifies the language of Article II that "[n]o bond . . . shall be enforceable unless and until it shall be validated," like Article II, it does not specifically address the issue of immunity from suit in United States courts. Following the reasoning of <u>Amerada Hess</u>, this language is, in effect, "stat[ing] that compensation shall [not] be paid" for certain bonds. <u>See</u> <u>id.</u>, 488 U.S. at 442. It is not explicitly expressing an intent to deny claimants access to United States courts to determine whether their bonds are enforceable. Again, as <u>Amerada Hess</u> requires, unless a treaty <u>expressly</u> conflicts with the FSIA's immunity provisions, the FSIA controls, and there is no express conflict here.

---

[10]The language of a treaty must be read in context in light of the treaty's object and purpose, <u>see</u> <u>In re Commissioner's Subpoenas</u>, 325 F.3d 1287, 1294 (11th Cir. 2003) (abrogated, in part, on other grounds, by <u>Intel Corp. v. Advanced Micro Devices, Inc.</u>, 542 U.S. 241, 253 (2004)), and the "context" of a treaty includes its preamble. <u>Gandara v. Bennett</u>, 528 F.3d 823, 827 (11th Cir. 2008).

12

Because we find that the plain language of the 1953 Treaty does not expressly conflict with the FSIA, we do not, and need not, consider the legislative history offered by Germany in support of its position.[11]

### III. Conclusion

As we find that the treaty exception does not apply, and the parties have agreed that the commercial-activity exception _does_ apply, we find that

---

[11]We note that the legislative history that Germany cites is taken from a "Message from the President of the United States Transmitting" the LDA and the 1953 Treaty, among others, for ratification to the Senate ("Message"). The portion of the Message cited by Germany is contained in "Enclosure 7(d)" ("Summary of Validation Law and Implementing Agreements"), appended to a letter from Secretary of State John Foster Dulles to President Eisenhower discussing the agreements submitted for ratification. Germany has argued that the Message reflects the State Department's (and Executive Branch's) interpretation of the 1953 Treaty, and as such is entitled to "great weight." See Sanchez-Llamas v. Oregon, 548 U.S. 331, 355 (2006) (quoting Kolovrat v. Oregon, 366 U.S. 187, 194 (1961)). But the Supreme Court has never instructed that a court give "great weight" to the State Department's or Executive's interpretation when the court's singular task is to determine whether a treaty expressly conflicts with the FSIA. And as we can conclude from the plain language of the 1953 Treaty, read in context, that there is no express conflict, we need not resort to extraneous sources. See In re: Commissioner's Subpoenas, 325 F.3d at 1294 (Only "if the treaty text is ambiguous when read in context in light of its object and purpose, then extraneous sources may be consulted to elucidate the parties' intent from the ambiguous text.") (citing Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134 (1989)).

Moreover, even if we were to consider the Message in our analysis, we find that when it is considered in its entirety, it is inconclusive as to the view of the State Department on the rights of bondholders who did not accept the LDA's offer of settlement to resort to United States courts. See Enclosure 7(a) ("Summary of Agreement on German External Debts and Its Annexes"), at 204. Thus, the Message does not alter our conclusion that the 1953 Treaty does not expressly conflict with the immunity provisions of the FSIA. Cf. Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 n.10 (1982) (giving "great weight" to the position of the State Department after noting that "[h]owever ambiguous the State Department position may have been previously," the Department's current interpretation was "beyond dispute" in light of an amicus brief filed in the case by the United States).

13

Germany is not immune from suit and affirm the district court's denial of Germany's motion to dismiss for lack of subject matter jurisdiction.[12]

We advise that this is <u>not</u> a decision as to whether World Holdings' bonds are, in fact, enforceable. We hold merely that the district court has the authority to decide that issue. The court may yet determine that World Holdings' failure to comply with the validation requirement of Article II renders its bonds unenforceable.[13] And, in fact, we expect that the district court will decide the issue of the applicability of Article II's validation requirement to World Holdings' bonds at the earliest possible opportunity.

**AFFIRMED.**

---

[12]This result means that we need not consider World Holdings' argument that Germany waived its affirmative defense of immunity by failing to specially plead immunity in its Answer. Alternatively, we do not consider the argument because it was raised for the first time on appeal. See <u>Calzadilla v. Banco Latino Internacional</u>, 413 F.3d 1285, 1287 (11th Cir. 2005).

[13]<u>See, e.g.</u>, <u>Mortimer Off Shore Services, Ltd. v. Federal Republic of Germany</u>, No. 05 Civ. 10669(GEL), 2007 WL 2822214, at *6, *11 (S.D.N.Y. Sept. 27, 2007) (aff'd by --- F.3d ----, 2010 WL 2891069, at *9 (2d Cir. Jul. 26, 2010)). In <u>Mortimer</u>, the district court held that the FSIA's commercial-activity exception applied to abrogate Germany's immunity, but then held that plaintiff's bonds were unenforceable because of a failure to comply with the bond validation procedures.

14