# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JOSE LUIS LEON,
Defendant and Appellant.

S143531

Riverside County Superior Court
RIF109916

January 23, 2020

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakuaye and Justices Chin, Liu, Cuéllar, Kruger, and Groban concurred.

Justice Cuéllar filed a concurring opinion.

PEOPLE v. LEON

S143531

Opinion of the Court by Corrigan, J.

While his estranged girlfriend was studying abroad, defendant Jose Luis Leon went to her home and fatally stabbed her grandmother and 13-year-old brother. He also attacked her grandfather with a hatchet. Although admitting the crimes, he claimed he acted in imperfect self-defense. He was convicted of two counts of murder and one count of attempted murder, with a multiple-murder special circumstance and enhancements for personal use of a deadly weapon and infliction of great bodily injury.[1] The jury fixed the penalty at death for one murder and life imprisonment without the possibility of parole for the other. The court imposed an additional sentence of life without possibility of parole plus four years for the attempted murder. We affirm the judgment.

## I. BACKGROUND

A. *Guilt Phase*

1. *Defendant's Relationship with the Ragland Family*

Veronica Haft and her younger brother, Austin Perez, lived with their grandparents, Hope and Marion Ragland. Hope

---

[1]  Penal Code sections 187, subdivision (a), 664/187, subdivision (a), 190.2, subdivision (a)(3), 12022, subdivision (b)(1), 12022.7, subdivision (a), and 1192.7, subdivision (c)(8) & (c)(23). All statutory references are to the Penal Code unless otherwise stated.

was a nurse, and Marion was retired.[2] They had raised Veronica since childhood. Austin came to live with them around age seven. Veronica was particularly close to Hope, whom she called "my best friend."

Veronica began dating defendant when she was 16. He said he was 19 but was actually 21. He had moved to the country from Mexico two years earlier and spoke only limited English. Veronica and her grandmother were fluent in Spanish. Veronica's brother and grandfather did not know Spanish and spoke with defendant in English.

The first year of their relationship was happy. Defendant spent time at the Ragland home and was included in their family activities. Hope initially welcomed defendant's presence, cooking for him and joining the couple on outings. A few months into the relationship, Hope purchased a red Ford Mustang for defendant, who agreed to make monthly payments to her. He kept up with the payments initially but later began missing them.

After defendant's parents moved back to Mexico, he rented an apartment from a woman Hope visited for tarot card readings. Defendant believed the two were involved in witchcraft. Around this time, defendant stopped working. He spent his days at the Ragland house and became increasingly possessive and jealous. Near the end of her senior year, Veronica suggested breaking up. Defendant responded by angrily punching his windshield and grabbing Veronica's wrist as she tried to leave the car.

---

[2] To avoid potential confusion, we refer to family members by their first names.

Hope argued with defendant frequently and warned Veronica that the relationship seemed abusive. Once, the family came out of church to find defendant waiting by their car. When Hope asked why defendant could not leave them alone, he insulted her in Spanish. Hope tried to slap him but missed. Defendant then ran around the parking lot laughing while Hope chased him.

Veronica attended the University of California, Riverside and secured a full scholarship to spend the spring term studying at Oxford. When told, defendant begged her not to go. This angered Hope, who told defendant to stop ruining Veronica's life. During the argument, Hope followed the couple outside and, at one point, moved as if to pick up a brick from the walkway. Veronica told Austin to call the police. Hope did not pick up the brick, and no one was injured.

Veronica went to England in mid-February 2003. Although she tried to end the relationship before leaving, defendant called her often. When he began calling 20 to 25 times a day, she turned off her phone. Defendant called on April 29, begging her to return to him. She spent more than two hours explaining the relationship was over. Defendant blamed Hope, but Veronica assured him the decision was hers. By the end of the conversation, defendant's tone had changed, and Veronica thought he had finally accepted the situation. Two days later, on May 1, Veronica answered a final call from defendant, who said, "No matter what happens . . . I'll always love you." Irritated, Veronica hung up. The attacks happened that night.

### 2. *Testimony Regarding the Night of the Murders*

The Raglands lived in a gated community near a small shopping center. Two video store employees who knew

defendant saw him shortly before 6:00 p.m. on May 1, 2003. Monique Perez saw him driving a red Mustang slowly around the parking lot. Not long thereafter, he walked toward the Raglands' house. Yvette Alvarez also saw him sometime after sundown, walking back at a faster pace.

Consistent with his usual routine, Marion left home around 6:20 p.m. to walk the family dog. Austin was at his friend Osvaldo Magdaleno's house, directly across the street. At some point, Magdaleno noticed defendant standing outside the community's gate. Pedestrian entrances to the property were kept locked, but defendant walked inside when a resident opened the gate to drive out. While playing outside, Magdaleno saw defendant inside the Ragland house, looking out the window. Austin went home but could not open the front door. No one answered his knock, so he jumped the back fence.

Marion returned home around 8:15 p.m., finding it odd that both the security screen and front door were locked. The moment he stepped inside, he was hit in the head. The noise of the impact was so loud Marion thought he had been shot. Fearing he had interrupted a robbery, he backed out and went to the shopping center for help. He managed to enter the video store with his head bleeding and asked the employees to check on his wife. Alvarez called 911. Marion sustained a severe concussion and skull fracture. Seventeen staples were required to close the wound.

Crime scene investigators found two bodies in the house. Hope had been killed while sitting in a lounge chair, but her body was stuffed into a kitchen closet. She had been stabbed eight times in the throat, chest, and abdomen. The neck wound pierced her larynx and jugular vein. Her lungs, pulmonary

4

artery, and aorta were also perforated. Austin lay in the kitchen, facedown in a pool of blood. Blood spatter evidence indicated he had been stabbed near a door leading to the garage then dragged into the kitchen. He had been stabbed 12 times. The wounds severed the jugular vein and carotid artery and perforated the liver, stomach, and aorta.

The contents of Hope's purse had been dumped on the floor, and "Austin is a bad student" was written on the living room mirror in Hope's lipstick. The upstairs rooms had been ransacked. In the backyard, investigators found a hatchet and a knife with a bent and bloody blade. A ski mask and vinyl gloves were later found in defendant's car, and his keys bore remnants of blood.

### 3. *Defendant's Police Interviews and Walkthrough*

After the murders, defendant arrived on time for his 10:00 p.m. shift at a local dairy. The police brought him to the station for questioning the next morning. He waived his *Miranda* rights[3] and spoke with the police.

During the initial interview, defendant adamantly denied committing the killings or even entering the Ragland house. In his first version, he said he went to the house to give Hope a car insurance payment but left because Marion was home. Marion did not like him and did not want him there while Veronica was away. Defendant claimed he had dinner then returned around 7:30 p.m. No one answered the door, so he sat on the porch but left when he saw Marion returning.

Questioned again the next morning, defendant said he was fearful and angry with Hope. He believed she put things in

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

his food and practiced witchcraft to ruin his relationship with Veronica. The day before the murders, Hope told defendant Veronica was having fun in England and would go many places without him after her return. Defendant became angry and emotional, as if "the devil got inside of me."[4] When he went to the house the next day, Hope taunted him with Veronica's happiness at Oxford. Defendant said, "[T]hat pissed me off so much that we started to fight. . . . a lot. She pulled out a knife . . ., but she didn't do anything to me." Hope tried to call the police, but he took the phone away. Defendant explained, "Then I remembered all the bad that she was doing to me, and I saw her with a look on her face that wasn't hers. Like with the look of a witch. [¶] And it scared me so much. And in a moment of desperation and everything we started to fight. And that was when I grabbed the knife that was there. [¶] And I started stabbing, and stabbing her. And then her son came in with a skateboard and he threw the skateboard at me and we also started to fight. . . . and I started to feel that everything got dark." He put Hope's body in a closet afterward because he was afraid of her, and he ransacked the house because he was looking for Veronica's new phone number. When Marion arrived, defendant hit him and fled.

Shortly after this interview, defendant provided additional details during a videotaped walkthrough at the crime scene. He and Hope argued. She stood and tried to slap him, but he grabbed her and took her phone. Hope retreated but came back at him holding a knife. They fell to the floor fighting.

---

[4] Defendant spoke Spanish in the interviews. All quotations attributed to him are to the English translation in the clerk's transcript.

Hope threatened to kill him, but he rolled on top of her and grabbed the knife. Hope threw him off, then lunged at him and impaled herself on the knife, afterward exclaiming, "What did you do to me?" Defendant "lost [his] mind" when he saw the blood and stabbed Hope repeatedly. When Austin came in, defendant dropped the knife. Seeing Hope, Austin yelled and tried to hit him with his skateboard. Defendant closed the sliding door so the neighbors would not hear the commotion. He took away the skateboard and tried to calm Austin, but the child ran toward the front door yelling for help. Defendant grabbed him and kicked the door shut. Austin struggled and tried to escape, so defendant stabbed him. Defendant said he sat crying for several minutes then looked for Veronica's new phone number. His anger returned. He went back to Hope's body and saw her lipstick on the floor. He stuffed her into a closet, then dragged Austin's body across the floor and wrote the message in lipstick on the mirror. Worried that Marion would return soon, defendant took a hatchet and a crowbar from the garage and waited for him in the living room. When Marion opened the front door, defendant threw the hatchet at him and fled. He dropped the knife outside. Defendant claimed everything he did was in self-defense.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

Veronica described Hope as happy, outgoing, and much loved by her friends and family. A nurse for 30 years, she cared greatly about her patients and was respected by her coworkers. She attended church every Sunday and gave Veronica a religious upbringing.

Veronica considered Hope her mother and "best friend." The two frequently did things together and expressed their love for each other. Hope encouraged Veronica to work hard in school and take advantage of opportunities she never had. When Veronica left for England, both became emotional because they were not used to being apart. Veronica was devastated to learn of the murders. She continued living with her grandfather, but their life was lonely, especially at holidays. She was no longer comfortable in the house, and they moved five months after the crimes. Veronica had difficulty with the loss and will always feel guilty for inviting defendant into their family.

Hope's nephew remembered her generosity. She cooked breakfast and dinner for the household every day, even though she worked full time. Holidays were especially hard for the family now.

Veronica testified that Austin came to the Raglands from a foster home. His birth mother abused drugs and had lost custody of her four children. Austin initially knew Hope as "grandma," but after a while began calling her "mom." Hope took him to church regularly. Austin was polite, respectful, and very popular. After he died, fellow students planted a tree in his memory. Marion enjoyed spending time with Austin. They regularly walked the dog, played catch, and worked outside together. He missed having Austin and Hope in his life and now spent most of his time alone.

### 2. *Defense Evidence*

Defendant grew up in a town about three hours south of Mexico City. He lived with his parents and three younger sisters in a small house that, for many years, lacked indoor plumbing. All of his extended family lived on the same dirt road. One sister

testified the home was humble but filled with love. Defendant and his eldest sister took a university entrance examination together but were not accepted. Defendant dreamed of marriage and a family. He enjoyed rural life and wanted to work with animals.

Around age 12, defendant began working with a neighbor, curing hides to make leather jackets. He worked half days while in school, then later full time. He was trustworthy, responsible, and hard-working. At age 16, when he was finishing school, defendant worked weekends at a pig ranch. His manager trusted him to work alone and considered him a good worker. At 17, defendant began training with his uncle to become a truck driver. The uncle thought defendant unusually naïve due to his strict and isolated upbringing. Defendant typically gave the money he earned to his mother.

Defendant's father once came to the United States but soon left because he missed the family. The father later returned to America, and defendant accompanied his mother to join him. They traveled 15 days and made four unsuccessful attempts before finally crossing the border at Sonora in 2000. Defendant never returned to Mexico. His mother and sisters missed him and hoped he would not be executed.

Defendant's girlfriend from Mexico testified that they began dating as teenagers. He often ate with her family and helped with chores. Her parents liked him and treated him like a son. The girlfriend's parents testified that they trusted defendant and believed he would have made a good husband. The couple loved each other and often talked of marriage and children. Defendant left for America during the girlfriend's first year at university. While parting was difficult, defendant felt

he had to go to protect his mother.  Initially, the couple spoke frequently by phone, but the relationship faded and defendant said he had met someone else.

A deputy sheriff who worked for two years at defendant's jail testified that he never had to report defendant for rules violations.  Defendant took adult education courses and correspondence courses in religion.  A correctional consultant interviewed defendant and reviewed his county jail history, finding no indication of future dangerousness.  The consultant believed defendant could be institutionalized and avoid future problems.  Once, when another inmate tried to intimidate him, defendant struck the man in the jaw, a response the witness considered appropriate under the circumstances.  Afterward, the two interacted without further animus.  Unlike most inmates facing capital charges, defendant had successfully shared living quarters with at least 15 others.  The witness was confident that, if given a life sentence, defendant could be successfully housed in a level 4 prison.  Defendant had no prior criminal record in Mexico or the United States.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Admissibility of Defendant's Confessions*

Defendant contends the court erred in admitting his confessions, both because he did not knowingly and intelligently waive his *Miranda* rights and because he was denied his right to consular notification under the Vienna Convention on

Consular Relations, April 24, 1963, 21 U.S.T. 77 (Vienna Convention).**⁵** The statements were properly admitted.

### a. Background

Before trial, defendant moved to suppress his statements. The court reviewed a videotape and transcript of defendant's first interview and heard testimony from an interrogating officer and a clinical psychologist.

Defendant was initially interviewed on May 2, 2003 at the Corona Police Department by Detective Ron Anderson and Corporal John Rasso. Rasso is a native Spanish speaker and certified as a bilingual officer. Rasso brought defendant water at the start of the interview. Before any mention was made of the murder, Rasso read defendant his *Miranda* rights in Spanish from a preprinted form. When admonishing in Spanish, Rasso takes care that the subject understands what is said. There are multiple Spanish dialects, and words in one may have a different meaning in others. Rasso "made sure" defendant would understand the dialect he chose. It appeared defendant understood Rasso, and Rasso was able to understand him. Rasso asked if defendant understood each right and defendant confirmed that he did. Defendant initially responded "uhm-hm," but Rasso asked him to clarify "yes or no." Defendant answered "yes" then, after a pause asked, "[D]oes my girlfriend already know" about the murders? Focusing on the *Miranda* issue rather than a discussion of the facts, Rasso

---

**⁵** Defendant contends admission of the statements violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, analogous state constitutional provisions, and the Vienna Convention.

responded, "[Y]ou have these rights with you. Do you want to talk about what happened last night or what?"

When defendant replied in the affirmative, Rasso gave him the form, which lists the rights in both Spanish and English and asks whether, with those rights in mind, the subject wishes to speak with police. Rasso crossed out the English portion of the form to indicate that the rights were given in Spanish. Rasso recorded defendant's Spanish replies that he both understood his rights and he wished to speak with officers. Defendant, Rasso, and Anderson all signed the form.

Defendant denied the murders and insisted he had not even gone into the house. The next day he was interviewed a second time, then walked through the crime scene with investigators. Before the interview, Rasso told defendant, "[Y]ou always have the right to, not, not talk to us. To not tell us anything, and . . . that way yesterday, . . . where I read you those rights." Defendant responded affirmatively. Rasso asked again, "[Y]ou understand that?" Defendant nodded. During that second interview, defendant confessed. In the subsequent walkthrough, Rasso reminded defendant of the rights he had read to him and said, "[Y]ou have [those rights] with you right now." He asked defendant to tell him if he wanted to exercise his rights.

Defense expert Dr. Francisco Gomez tested defendant to assess his ability to understand the *Miranda* advisements. Defendant consistently performed in the borderline range on intelligence tests, indicating low intellectual functioning. He reported failing sixth grade, which was consistent with "mild

retardation" or borderline intelligence.[6]  Gomez administered screening tests for intelligence.  He did not go on to assert whether defendant was intellectually disabled.  He was not asked, nor did he give, a specific IQ score for defendant.

Defendant read, in Spanish, at a third to fifth grade level.  In Gomez's view, understanding the *Miranda* warnings requires at least seventh grade level reading comprehension.  Defendant was depressed, with low self-esteem and a "dependent" personality.  He was passive, anxious, and agreeable, "a follower" who might "be easily manipulated."  Gomez detected no symptoms of any thought disorder.

Although defendant had been in the United States for some time, his acculturation was very low.  He had been sheltered for most of his life, living with family and securing jobs through friends.  Because he grew up in a small town and had never been in trouble, defendant's knowledge of the legal system came mainly from Mexican soap operas.  He had the distorted view that American police are very aggressive.  For example, he once interrupted the officers to ask, " 'Are they gonna kill me today, or are they gonna kill me tomorrow?' "

Gomez acknowledged that defendant was initially read the full *Miranda* warnings from a form, "which is the standard way of doing it."  He was reminded of the rights twice on the second day of questioning.  In addition, Corporal Rasso

---

[6]  The witness used the terms "mildly retarded" and "mild retardation."  In accordance with current law and usage, this court now uses the phrase "intellectually disabled" except when quoting or characterizing a source that uses older terms.  (See, e.g., *People v. Boyce* (2014) 59 Cal.4th 672, 717, fn. 24 (*Boyce*); see also Stats. 2012, ch. 448.)

explained to defendant that the prosecutor who was with them in the crime scene walkthrough was not his lawyer but was "the attorney for . . . the law." Defendant was told he would be given his own attorney when he went to court. The third time defendant was given the *Miranda* warnings, later in the walkthrough, he agreed he would tell Rasso if he wanted to invoke his rights, then added, "[W]ell anyway when I go to court my attorney is going to be there right?" To Gomez, this response implied defendant did not understand his rights. Gomez opined that defendant lacked the intellectual ability to understand the *Miranda* warnings as they were read to him. He only said he understood because his passive nature inclined him to agree with authority figures.

On cross-examination, Gomez acknowledged that defendant lied to police almost immediately after he agreed to talk to them. The doctor was aware that there was writing in English on "a window" at the crime scene. Gomez did not read the statement but agreed that if it said, "Austin is a bad student," the statement would be grammatically correct. Gomez was unaware that defendant was able to consult want ads, find two different apartments, or move in and pay rent. He admitted defendant "concocted a story." He was unaware that after the murders defendant went to the dairy and worked a normal shift. During the first interview, when told the family had been killed, defendant appeared to cry and denied involvement. Gomez agreed that was a lie. Gomez asserted he was providing an opinion based on "the best information available," but he admitted he did not read the police reports, interview defendant's coworkers, or do further evaluation for IQ testing.

The court denied the suppression motion. Referring to defendant's demeanor in the videotaped interview, the court

14

observed, "[T]here is not even a scintilla of evidence to suggest that he did not understand the rights that were read to him. He immediately responded in the affirmative, either through a nod or audible answer, that he understood them, that he was willing to waive them and talk to the officers." Defendant's understanding could also be inferred from the lies he told after waiving his rights. The court noted, "Clearly, he knew he was in trouble and he needed to come up with some sort of explanation regarding the conduct he was being accused of, and he set forth a story denying even being present." Defendant spoke clearly and without hesitation. He did not ask for questions to be repeated. Furthermore, there was no evidence the police induced his statements through any threats or promises of reward. The court concluded it was "abundantly clear" that defendant understood his rights and voluntarily and intelligently waived them. The court acknowledged that the preponderance of evidence standard applied but noted, "in fact, if the standard were even higher, it would be beyond a reasonable doubt that he understood his rights and voluntarily and intelligently waived them."

### b. *Validity of the Miranda Waiver*

"To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation (*Miranda, supra,* 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation (*id.* at pp. 444-445)." (*People v. Jackson* (2016) 1 Cal.5th 269, 338-339.) A suspect who has heard and understood these rights may waive them. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 104; *People v. Tate* (2010) 49 Cal.4th 635,

683.) "[T]he prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*People v. Linton* (2013) 56 Cal.4th 1146, 1171; see *Moran v. Burbine* (1986) 475 U.S. 412, 421; *People v. Williams* (2010) 49 Cal.4th 405, 425.) This analysis requires an evaluation of both the defendant's state of mind and circumstances surrounding the questioning. (*People v. Nelson* (2012) 53 Cal.4th 367, 375; see *Fare v. Michael C.* (1979) 442 U.S. 707, 725.) On appeal, we accept the trial court's factual findings and credibility assessments if supported by substantial evidence. (*People v. Case* (2018) 5 Cal.5th 1, 20; *People v. Duff* (2014) 58 Cal.4th 527, 551; *People v. Dykes* (2009) 46 Cal.4th 731, 751.) " ' " 'We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*Duff*, at p. 551.)

Defendant cites several circumstances to show he did not knowingly and intelligently waive his *Miranda* rights. He argues he was distressed and inattentive during the advisements, merely affirming his understanding and agreeing to talk out of a need to please authority figures. The advisements were read to him all at once, rather than individually, which defendant suggests gave him less time to consider their significance. Defendant similarly contends his signing of the waiver form was perfunctory. He looked at the form only briefly and signed without reading. Separately, relying on Gomez's testimony, defendant argues he lacked the

cognitive ability, acculturation, or criminal justice experience to make a knowing and intelligent waiver. To the contrary, ample evidence supports the trial court's conclusion that defendant understood the *Miranda* rights and validly waived them.

Defendant waived his rights at the beginning of the first interview, before any questions were asked about the incident. The videotape indicates that Rasso read the *Miranda* rights slowly. He paused periodically and looked up. Defendant nodded throughout this recitation and immediately responded in the affirmative when asked if he understood "all of these rights" as read to him. He also immediately and unequivocally agreed to "talk about what happened last night" and signed the *Miranda* waiver form without hesitation. In his responses and demeanor, defendant exhibited no reluctance to speak with the police. There is no suggestion, and no allegation, that the officers used coercive interrogation tactics or made improper promises. There is substantial evidence of voluntariness. (See *People v. Whitson* (1998) 17 Cal.4th 229, 248-249; *Colorado v. Connelly* (1986) 479 U.S. 157, 164.) Nor is there any allegation that defendant did not understand the language of the warnings. Rasso verbally advised defendant in Spanish, taking care to match defendant's dialect, and used a waiver form printed in Spanish. (See *People v. Cruz* (2008) 44 Cal.4th 636, 666, 668-669.) Defendant claims he was distressed and inattentive during the *Miranda* warnings because he reached for a tissue and answered that he understood his rights only as part of his question about whether Veronica was aware of the murders. However, the videotape reveals a more subdued reaction to news of the murders than defendant now depicts, and he was advised of his rights before officers shared any details about their investigation. Moreover, the tape reveals that

defendant's affirmation of understanding was separate from his question about his girlfriend. Defendant first nodded and said, "mmhmm" when asked if he understood his rights. Prompted for a verbal answer, defendant immediately responded, "yes." He did not ask about his girlfriend until approximately three seconds later, during the silence while Rasso was preparing the waiver form.

The trial court rejected defendant's claim that he lacked the intellectual capacity and experience necessary to make a knowing and intelligent waiver. Our independent review of the videotape supports that conclusion. We have not decided that any particular intelligence or experience level is required to understand the *Miranda* warnings or to waive them. (See *People v. Kelly* (1990) 51 Cal.3d 931, 951.) Moreover, defendant's attempt to deceive the officers in his initial interview indicates attentiveness and an awareness of his circumstances. He was not so inattentive or distracted during the questioning that he could not formulate a false account of what happened.

Defendant's reliance on federal appellate cases is also unavailing. The cases are not controlling precedent and are factually distinguishable. In *Cooper v. Griffin* (5th Cir. 1972) 455 F.2d 1142, 1144-1145, the defendants were only 15 and 16 years old and demonstrated considerable intellectual deficiency. They read at or below third grade level and had IQs ranging between 61 and 67, well into the "mentally retarded" range. (*Id.* at p. 1145.) Moreover, uncontroverted testimony from four of their special education teachers established that neither was capable of understanding the *Miranda* warnings, let alone the consequences of waiving their rights. (*Id.* at pp. 1145-1146.) In *U.S. v. Garibay* (9th Cir. 1998) 143 F.3d 534, 537-539, the

defendant was interrogated in English even though his primary language was Spanish and he had difficulty understanding English. Even with this discrepancy, and the defendant's borderline intellectual disability, the court suggested the claim would have been rejected if officers had obtained a written waiver. (*Id*. at p. 539, fn. 10.)

Apart from Gomez's testimony, which the trial court was entitled to reject, the record reveals no basis to conclude defendant's *Miranda* waiver was anything other than knowing, intelligent, and voluntary. Having been admonished in his own language, defendant, an adult, repeatedly affirmed both verbally and in writing his understanding of the *Miranda* rights and his desire to waive them. The trial court's denial of the suppression motion is well supported.

### c. *Violation of Consular Rights*

It is undisputed that the officers did not alert defendant to his right to have the Mexican consulate notified of his detention, as required by section 834c and the Vienna Convention. The court declined to suppress defendant's statements as a remedy because it found no prejudice flowed from the omission. While a member of the consulate might have responded and advised defendant to remain silent, the court found in regard to the *Miranda* waiver that defendant understood his rights to counsel and silence. Nevertheless, defendant "couldn't wait [to] get started talking about his lack of involvement in this. [¶] Yes, ultimately his story changed and he did admit criminal conduct, but he had no hesitation whatsoever, none, in talking to the police officers."

"Article 36, paragraph 1(b), of the Vienna Convention provides that law enforcement officials 'shall . . . inform'

arrested foreign nationals of their right to have their consulate notified of their arrest, and if a national so requests, inform the consular post that the national is under arrest." (*People v. Mendoza* (2007) 42 Cal.4th 686, 709.) Article 36 generally requires that such an advisement be given "without delay." (Vienna Convention, *supra*, art. 36, at p. 23 (Article 36); see § 834c, subd. (b).) California implemented the Convention's requirements in section 834c. (See Howell, *A Proposal for U.S. Implementation of the Vienna Convention's Consular Notification Requirement* (2013) 60 UCLA L.Rev. 1324, 1366.) Our statute requires law enforcement to inform any "known or suspected foreign national" of the right to consular notification when the foreign national has been arrested, booked, or detained for more than two hours. (§ 834c, subd. (a)(1).)

Several minutes into his first interview, defendant told the police he was "an illegal Mexican" and did not "have papers here." The officers therefore had reason to know he was a foreign national. Moreover, while it is unclear how long defendant had been detained when he declared his immigration status, he was in police custody for well over two hours before confessing to the murders. Under these circumstances, section 834c and Article 36 required the officers to advise defendant of his right to consular notice. They failed to do so. It should go without saying that law enforcement officers are obligated to follow the Penal Code. The question here is whether defendant is entitled to relief.

We have assumed, without deciding, that Article 36 gives foreign nationals individual, enforceable rights. (See *In re Martinez* (2009) 46 Cal.4th 945, 957, fn. 3.) Even so, "Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their

consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." (*Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 349 (*Sanchez-Llamas*).) Accordingly, the "failure to notify a suspect of his or her consular rights does not, in itself, render a confession inadmissible" under Article 36. (*People v. Enraca* (2012) 53 Cal.4th 735, 756 (*Enraca*); see *Sanchez-Llamas*, at p. 349.) It appears no case has addressed potential penalties for noncompliance with section 834c. Because defendant's claim does not raise the issue, we have no occasion to decide the proper scope of any remedy available for a section 834c violation.

A consular notification claim may be raised as part of a broader challenge to the voluntariness of a confession. (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 350.) But defendant does not claim his statements to police were involuntary. As a result, he frames his consular notification argument somewhat differently, asserting the lack of consular notice is a circumstance that rendered his *Miranda* waiver invalid because the waiver was not knowing or intelligent. Assuming this argument is appropriate, it fails because defendant has established no relation whatsoever between his confession and the lack of consular notice. Defendant asserts he needed consular assistance because he was poorly acculturated and inexperienced. He contends, "*Miranda* advisements read from a form by an interrogating police officer" could not substitute for the "full[] and careful[]" explanation of his rights from a representative of the consulate. Even assuming defendant

might have received a more compelling advisement from a consular representative, the suggestion that he would have deferred to this advice is entirely speculative. Defendant was told, clearly and in Spanish, that he had the rights to remain silent and have an attorney's assistance. He asked no questions and exhibited no confusion or hesitation before waiving these protections. On the contrary, as the trial court observed, he seemed eager to talk with the officers. Having been fully advised of his rights to silence and a free attorney, defendant nevertheless chose to speak with the police and actively participated in the questioning. Although sometimes tearful, defendant never stopped responding or asked to end the interview. Defendant's immediate, continued, and active participation belies the suggestion he would have remained silent if advised of his consular rights. (See *Enraca*, *supra*, 53 Cal.4th at pp. 757-758.)

## 2. *Instruction Regarding Preoffense Statements*

Defendant claims the court improperly gave CALJIC No. 2.71.7, which instructs that a defendant's statements reflecting intent, plan, motive, or design must be viewed with caution.[7] The instruction was appropriate as supported by the evidence and any possible error was harmless.

Veronica testified that defendant had difficulty accepting the end of their relationship and blamed Hope for influencing Veronica's decision. In a phone call two days before the murders, defendant told Veronica, "I know it's [Hope] that's

---

[7] Defendant asserts the instruction violated his rights to present a defense and to a fair trial and penalty under the Sixth, Eighth and Fourteenth Amendments, and analogous state constitutional provisions.

making you think like this." Veronica also testified that in their last brief phone call, on the day of the murders, defendant said, "No matter what happens . . . I'll always love you." Although Veronica found the statement odd, she was mainly irritated by the call.

Based on these two statements, the prosecution requested CALJIC No. 2.71.7. As read to defendant's jury, this instruction states: "Evidence has been received from which you may find that an oral statement of intent, plan, motive, or design was made by the defendant before the offense with which he is charged was committed. It is for you to decide whether the statement was made by the defendant, and evidence of such an oral statement ought to be viewed with caution." Defense counsel objected that the instruction applies only when there has been an "actual" or "blatant" statement of intent or planning. He noted that "obviously inferences can be made from" defendant's statements but suggested these inferences did not require a jury instruction. The court responded, "You've kind of answered your own objection there. There is an inference that he's intending to do something in the future, something evil. Generally speaking, the law is that if there is some evidence that supports an instruction, it should be given."

We recently held that trial courts need not instruct the jury to view defendant's extrajudicial statements with caution unless such an instruction is requested by the defense. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189-1190.) However, "[t]he law in effect at the time of [defendant's] trial was clear: A trial court had the duty to instruct the jury *sua sponte* to view a defendant's oral admissions with caution." (*People v. Johnson* (2018) 6 Cal.5th 541, 587, italics added (*Johnson*); see *People v. Carpenter* (1997) 15 Cal.4th 312, 392-393; *People v. Beagle*

(1972) 6 Cal.3d 441, 455.) If the jury heard evidence of a defendant's inculpatory statement, or from which an inculpatory statement could be inferred (see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1136-1137), a cautionary instruction such as CALJIC No. 2.71 or 2.71.7 was required even over defense objection. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1157 (*Zambrano*).)

Defendant argues the instruction was not supported by the evidence. "A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) Veronica's testimony supported the instruction. Defendant acknowledges that she testified about the statements in question but disputes the reasonable inferences that could be drawn from them. Defendant insists his statement "No matter what happens, I'll always love you" did not suggest an "intent, plan, motive, or design" to kill, but "was simply the classic lament of a man professing eternal and unconditional love for a young woman who has told him she wants to end their relationship." While this is one possible interpretation of the statement, it is not the only one. Even defense counsel acknowledged that ominous inferences could be drawn from the statement, in which defendant suggested something might "happen" only hours before he went to the Ragland house, murdered Hope and Austin, and attacked Marion with a hatchet. Defendant's innocent interpretation is also at odds with his other statement, blaming Hope for "making [Veronica] think like this." This earlier statement conveys defendant's apparent aggravation with Hope and could support a conclusion that he harbored a criminal intent. Ultimately, the jury had to decide whether defendant actually made the

statements attributed to him, and, if so, what the statements implied.  The cautionary instruction properly informed them how to evaluate this evidence.

Defendant argues the jury's only proper role under CALJIC No. 2.71.7 is to determine whether the defendant made a statement attributed to him, not whether the statement expressed an intent, motive, plan, or design.  He complains CALJIC No. 2.71.7 improperly suggested that jurors were *required* to view his extrajudicial statements as expressions of criminal intent.  We rejected a similar claim in *Zambrano*, *supra*, 41 Cal.4th at page 1157, and do so again here.  "Far from presenting motive as a predetermined 'fact,' the instruction merely stated that the jury '*may*' find defendant expressed such a motive and must view any *such* expression with caution." (*Ibid.*, italics added)  Moreover, the jury would have understood from numerous other instructions that it was the ultimate judge of all disputed facts.  Indeed, just before CALJIC No. 2.71.7, the judge read CALJIC No. 2.70, which stated they were "the exclusive judges as to whether the defendant made a confession or an admission, and if so, whether that statement is true in whole or in part."  The court also instructed jurors to disregard any instructions that were inapplicable to what they found to be the facts. (CALJIC No. 17.31.)  In the context of the instructions as a whole, the meaning of CALJIC No. 2.71.7 would have been clear.

Finally, any error in giving the instruction was clearly harmless.  As we have previously observed, CALJIC No. 2.71.7 generally serves a salutary purpose.  "[T]he principal effect of the instruction was to reemphasize, on defendant's behalf, that his inculpatory extrajudicial statements, if any, should be

viewed with caution." (*Zambrano*, *supra*, 41 Cal.4th at pp. 1157-1158.)

### B. *Penalty Phase Issues*

#### 1. *Instructions Requested by Defense*

Defendant challenges the court's denial of his request to change to CALCRIM instructions at the penalty phase and its refusal to give three special instructions.[8] We conclude there was no prejudicial error.

#### a. *CALCRIM Instructions*

Before trial began, the court gave counsel the option of using either CALJIC jury instructions or the CALCRIM instructions that had recently been released. The court said it would not "mix and match" the two types of instructions.[9] Defendant's attorneys agreed that the CALJIC instructions were "fine," and CALJIC instructions were given in the trial's guilt phase. At the penalty phase, however, defense counsel wanted to use CALCRIM instructions because he felt they better explained some concepts. Specifically, counsel preferred CALCRIM No. 763 to CALJIC Nos. 8.85 and 8.88. Although he

---

[8] Defendant's instructional error claims assert violations of his rights to due process and a fair penalty trial under the Fifth, Eighth, and Fourteenth Amendments and analogous California constitutional provisions.

[9] The Judicial Council's official guide for using the CALCRIM instructions states: "The CALJIC and CALCRIM instructions should *never* be used together. While the legal principles are obviously the same, the organization of concepts is approached differently. Mixing the two sets of instructions into a unified whole cannot be done and may result in omissions or confusion that could severely compromise clarity and accuracy." (Judicial Council of Cal., Crim. Jury Insts. (2019) p. xxii.)

acknowledged that the CALCRIM instructions are not meant to be combined with other model jury instructions, he argued there was no risk of confusion because jurors would be admonished to disregard all of the CALJIC instructions given in the guilt phase. The court denied the request, preferring to maintain consistency in the instructions used throughout trial. Defendant now argues this decision was an error of constitutional dimension. We disagree.

Defendant's argument rests entirely on the complaint that CALJIC No. 8.88 is inferior to its counterpart, CALCRIM No. 766. Defendant's jury was given CALJIC No. 8.88, explaining that a death verdict requires each juror to be persuaded "that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." In contrast, CALCRIM No. 766 would have instructed the jury to decide whether a death sentence was "appropriate and justified." Defendant argues the verb "warrant" imposes a lesser standard. He suggests jurors might have misunderstood the instruction to mean that a death sentence was "warranted" simply because it was permitted.

We have frequently rejected this argument. (See, e.g., *People v. Landry* (2016) 2 Cal.5th 52, 122; *People v. Townsel* (2016) 63 Cal.4th 25, 73.) CALJIC No. 8.88's instruction that each juror consider whether death was " 'warrant[ed]' " was not error because the instruction twice references the jury's duty to decide the death penalty's appropriateness. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1361.) First, the instruction explains that a mitigating circumstance is one that "may be considered as an extenuating circumstance *in determining the appropriateness of the death penalty*." (CALJIC No. 8.88, italics

27

added.)  Second, the instruction tells jurors to "determine under the relevant evidence *which penalty is justified and appropriate* by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (*Ibid*., italics added.)  Defendant dismisses these references as mere "prefatory" filler.  This argument distorts the instruction's meaning by focusing on one word taken out of context. Considered as a whole, "the instruction properly conveyed to the jury that circumstances 'warrant[]' the death penalty when such punishment is appropriate in the eyes of the jury." (*McKinzie*, at p. 1361.)  Accordingly, it was not error for the court to give CALJIC No. 8.88, and it was within the court's discretion to deny defendant's request for CALCRIM instructions in the penalty phase.

### b.  *Special Instructions*

Defendant next claims the court erred in refusing three proposed special instructions based on CALCRIM No. 763.  The court declined to give the instructions, concluding the information was adequately conveyed by CALJIC No. 8.85.

Defendant's first proposed instruction stated:  "You may consider sympathy or compassion for the defendant."  However, the jury had already been instructed that it could consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (CALJIC No. 8.85.)  We have consistently held that "CALJIC No. 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including

sympathy and mercy," and no further instructions on the subject are required. (*People v. Burney* (2009) 47 Cal.4th 203, 261; accord *Boyce, supra,* 59 Cal.4th at pp. 706-707.) Defendant's special instruction was duplicative of CALJIC No. 8.85. (See *People v. Gurule* (2002) 28 Cal.4th 557, 659.)

The second proposed instruction stated: "You may not consider as an aggravating factor anything other than the factors contained in this list that you conclude are aggravating in this case. You must not take into account any other facts or circumstances as a basis for imposing the death penalty." On request, trial courts generally should permit an instruction explaining that only the listed sentencing factors and related evidence may be considered in aggravation. (See *People v. Gordon* (1990) 50 Cal.3d 1223, 1275, fn. 14; *People v. Williams* (1988) 45 Cal.3d 1268, 1324.) However, any error in refusing such an instruction is "nonprejudicial under any standard [where] the record does not suggest that any extraneous 'factors' were in fact presented to or considered by the jury." (*Williams*, at p. 1324.) That standard is satisfied here. The concept that aggravating evidence is limited to that described in CALJIC No. 8.85 is reasonably inferable from that instruction, which directs jurors to consider the listed sentencing factors "if applicable." (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1100; *Gordon*, at p. 1275, fn. 14.)

Moreover, no evidence or argument here concerned a nonstatutory factor. There was guilt phase evidence that defendant went to work as usual on the night of the murders and did not seem agitated. That evidence was relevant to show that mitigation was *not* appropriate under section 190.3, factor (d). Factor (d) permits mitigation if the offense was committed while the defendant was under the influence of an

extreme mental or emotional disturbance. (§ 190.3, factor (d).) Defendant asserts his special instruction was needed because the prosecutor's closing argument mentioned "how normal, how fine" defendant acted during the videotaped walkthrough. However, in the very next sentence the prosecutor linked this comment to factor (d), stating, "There's no evidence at all under factor (d)." No argument was made that defendant's demeanor could be used as an aggravating factor. Because there was no basis for the jury to have considered aggravation on a nonstatutory basis, any error in failing to give defendant's special instruction was harmless.

Defendant's third proposed instruction stated: "Even if a fact is both a 'special circumstance' and also a 'circumstance of the crime,' you may consider that fact only once as an aggravating factor in your weighing process. Do not double-count that fact simply because it is both a 'special circumstance' and a 'circumstance of the crime.' " There is no sua sponte duty to instruct that facts supporting a special circumstance may not also be used as an aggravating factor. (See *People v. Salazar* (2016) 63 Cal.4th 214, 254 (*Salazar*); *People v. Ramirez* (2006) 39 Cal.4th 398, 476.) However, "[a] trial court should, when requested, instruct the jury against double-counting these circumstances." (*People v. Monterroso* (2004) 34 Cal.4th 743, 789.) "The literal language of [section 190.3, factor] (a) presents a theoretical problem . . . since it tells the penalty jury to consider the 'circumstances' of the capital crime *and* any attendant statutory 'special circumstances.' Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.' . . . [¶] However, the possibility of

actual prejudice seems remote. . . ." (*People v. Melton* (1988) 44 Cal.3d 713, 768.)

The Attorney General concedes omitting the instruction was error but contends it was harmless. We agree. There is no reasonable likelihood the jury would have misunderstood the instructions to permit double counting. (See *People v. Ayala* (2000) 24 Cal.4th 243, 289.) " '[T]he standard instructions do not inherently encourage the double counting of aggravating factors. [Citations.] We have also recognized repeatedly that the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor.' " (*Ibid*.; see *Boyce*, *supra*, 59 Cal.4th at p. 714.) There was no misleading argument. Although the prosecutor mentioned that two people had been killed, he did not suggest that this fact be given additional aggravating weight.

### 2. *Constitutionality of Death Penalty Law*

Defendant raises several familiar challenges to the constitutionality of California's death penalty scheme. Although recognizing we have previously rejected all of these arguments, he renews them to urge reconsideration and preserve the issues for federal review. We decline to reconsider our settled precedent and continue to hold the following:

The category of death-eligible defendants under section 190.2 is not unconstitutionally overbroad. (*People v. Winbush* (2017) 2 Cal.5th 402, 488 (*Winbush*); see *People v. Reed* (2018) 4 Cal.5th 989, 1018.) Section 190.3, factor (a), allowing aggravation based on the circumstances of the crime, does not result in arbitrary and capricious sentencing. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1129; see *Salazar*, *supra*, 63

Cal.4th at p. 255.) The death penalty scheme is not unconstitutional for failing to require written findings (*Winbush*, at p. 490), unanimous findings (*People v. Wall* (2017) 3 Cal.5th 1048, 1072 (*Wall*)), or findings beyond a reasonable doubt as to the existence of aggravating factors other than section 190.3, factors (b) and (c), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty. (*Winbush*, at p. 489; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235.) These conclusions are not altered by *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, or *Hurst v. Florida* (2016) 577 U.S. \_\_, 136 S.Ct. 616. (*People v. Henriquez* (2017) 4 Cal.5th 1, 45 (*Henriquez*).) The prosecution is not constitutionally obligated to bear a burden of proof or persuasion in sentencing, which is "an inherently moral and normative function, and not a factual one amenable to burden of proof calculations." (*Winbush*, at p. 489.) " 'Nor is an instruction on the *absence* of a burden of proof constitutionally required.' " (*People v. Jones* (2017) 3 Cal.5th 583, 619.) The federal Constitution also does not require an instruction that life is the presumptive penalty. (*Wall*, at p. 1072; *Salazar*, at p. 256.)

CALJIC No. 8.88 is not defective for failing to require a determination that death is the "appropriate" penalty (see *ante*, at p. 25; see also *Salazar*, *supra*, 63 Cal.4th at p. 256; *Boyce*, *supra*, 59 Cal.4th at p. 724) or failing to require a life sentence if mitigating factors outweigh aggravating ones (*Johnson*, *supra*, 6 Cal.5th at p. 594; *People v. Moon* (2005) 37 Cal.4th 1, 42). This instruction's use of the phrase "so substantial" is not overbroad or unconstitutionally vague. (*Wall*, *supra*, 3 Cal.5th at p. 1073; *Salazar*, at p. 256.) CALJIC No. 8.85's use of the words "extreme" and "substantial" to describe mitigating

circumstances does not impermissibly limit the jury's consideration of mitigating factors. (*People v. Rices* (2017) 4 Cal.5th 49, 94; *Wall*, at p. 1073.) Nor is CALJIC No. 8.85 flawed because it tells the jury not to consider sympathy for defendant's family as a mitigating factor. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1178-1179; *People v. Bemore* (2000) 22 Cal.4th 809, 855-856.) The court was not constitutionally obligated to delete inapplicable sentencing factors, designate which factors are aggravating or mitigating, or instruct that certain factors are relevant only in mitigation. (*Winbush*, *supra*, 2 Cal.5th at p. 490; *People v. Cook* (2006) 39 Cal.4th 566, 618.)

The federal Constitution does not require intercase proportionality review. (*Johnson*, *supra*, 6 Cal.5th at p. 594; *Winbush*, *supra*, 2 Cal.5th at p. 490.) Nor does the death penalty statute violate equal protection by providing different procedural safeguards to capital and noncapital defendants. (*Johnson*, at p. 594; *Henriquez*, *supra*, 4 Cal.5th at p. 46.) Finally, we have repeatedly held that California's capital sentencing scheme does not violate international norms or evolving standards of decency in violation of the Eighth and Fourteenth Amendments. (*Henriquez*, at p. 47; *Winbush*, at p. 490; *Boyce*, *supra*, 59 Cal.4th at p. 725.)

## C. *Cumulative Error*

Defendant asserts that errors in his trial were cumulatively prejudicial. We have held that potential errors in denying instructions on aggravating evidence and double counting were harmless. Even considered together, these omissions do not warrant reversal. (See *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 63.)

D. *Restitution Fine*

At the time of defendant's crimes, section 1202.4, subdivision (b) required the court to impose a felony restitution fine between $200 and $10,000. A defendant's inability to pay could be considered in setting a fine above the minimum level. (§ 1202.4, subd. (c).) The court ordered defendant to pay a $10,000 restitution fine; however, this fine was not mentioned in defendant's sentencing hearing or the court's oral pronouncement of judgment. Because the subject of restitution was not raised, defendant had no opportunity to object to the $10,000 fine. Accordingly, we will not consider his claim forfeited. (Cf. *People v. Miracle* (2018) 6 Cal.5th 318, 356 [failure to object at sentencing hearing forfeits excessive fine claim].)

The trial court is generally required to include all aspects of a judgment in its oral pronouncement of judgment. (See *People v. Mesa* (1975) 14 Cal.3d 466, 471.) Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error. (*Ibid*.) The abstract of judgment "does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

The Attorney General agrees the record does not support imposition of a $10,000 restitution fine. Instead of remanding for a restitution hearing, which would entail an inordinate expenditure of resources, he agrees with defendant that the fine should be reduced to the $200 statutory minimum. Defendant's proposal is appropriate. (See *Wall*, *supra*, 3 Cal.5th at p. 1076; *People v. Mitchell*, *supra*, 26 Cal.4th at p. 188.)

## III. DISPOSITION

The judgment is affirmed. On remand, the trial court shall amend the abstract of judgment to reflect the minimum restitution fine of $200 under section 1202.4, subdivision (b).


**CORRIGAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

PEOPLE V. LEON

S143531

Concurring Opinion by Justice Cuéllar

As 93 million Americans managed to travel abroad last year to nearly every corner of the planet, the United States hosted almost 80 million foreign nationals. (Nat. Trade and Tourism Off., U.S. Dept. of Commerce, U.S. Citizen Traffic to Overseas Regions, Canada & Mexico 2018 (Feb. 2019) U.S. Citizen Travel to International Regions: 2018 <https://travel.trade.gov/view/m-2018-O-001/index.html> [as of Jan. 23, 2020]; Nat. Trade and Tourism Off., U.S. Dept. of Commerce, U.S. Travel and Tourism Industry (Oct. 2019) International Visitors to the U.S. <https://travel.trade.gov/outreachpages/download_data_table/Fast_Facts_2018.pdf> [as of Jan. 23, 2020].)[1] When our country ratified the Vienna Convention on Consular Relations in the early 1960s, we gave our word that the United States would treat foreigners in our country with dignity by allowing them contact with their country's consular officials — and we let the world know we expected no less for Americans traveling abroad. (Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (Vienna Convention).) While today's decision underscores how article 36 of the Vienna Convention grants certain protections to detained foreign nationals, it also describes a troubling failure of police to

_____

[1]    All Internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/38324.htm>.

1

fulfill the treaty's obligations. Lurking at the edge of this case is the problem I write to highlight: how law enforcement agencies and courts can help ensure we honor our country's promise when it ratified the Vienna Convention.

Law enforcement officials have a duty under article 36, paragraph 1(b) of the Vienna Convention. They must inform arrested foreign nationals, without delay, of their right to have their consulate notified about their arrest or detention. (Vienna Convention, art. 36 (Article 36); *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 349 (*Sanchez-Llamas*).) And when the national so requests, law enforcement officers shall inform the appropriate consular post that their citizen is under arrest. (*People v. Enraca* (2012) 53 Cal.4th 735, 756 (*Enraca*).) In principle, the United States and other countries who ratified the Vienna Convention treat consular notification as foundational to the sensible treatment of their nationals abroad. When the citizens of any country cross national boundaries, certain concerns of theirs tend to be shared with citizens of every country: to remain within range of help from one's country. Consular notification allows foreign nationals to obtain legal and diplomatic assistance, among other support, as well as a means for contacting family. (See *Sanchez-Llamas*, at pp. 367-368 (dis. opn. of Breyer, J.); Buys, et al., *Do unto Others: The Importance of Better Compliance with Consular Notification Rights* (2011) 21 Duke J. Comp. & Int'l. L. 461, 469-474.)

The majority rightly observes that Article 36 does not command consular intervention or require law enforcement officers to halt an investigation pending consular notification. (Maj. opn., *ante*, at p. 21.) A failure to notify a suspect of their consular rights does not — in itself — render a confession inadmissible under Article 36. (Maj. opn., *ante*, at p. 21.) But

implicit in our country's promise to honor the Vienna Convention are issues of right, remedy, and responsibility that call for more — and more serious — attention.

Whether or not violations of this international treaty ever require a specific judicial remedy, such as the suppression of statements made to police, our failure to honor our treaty commitment deserves to be remedied. In fact, the United States Supreme Court has articulated several possible remedies for a consular notification violation. A defendant may raise an Article 36 claim, for example, as part of a broader challenge to the voluntariness of the statements defendant made to police. (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 350.) If a defendant raises an Article 36 violation at trial, the court can make accommodations to secure for the defendant the benefits of consular assistance. (*Sanchez-Llamas*, at p. 349.) And suppression may be the only effective remedy in certain situations, specifically, where there is a "connection between an Article 36 violation and evidence or statements obtained by police." (*Ibid.*) Although none of these remedies appear appropriate to address the violation of defendant Jose Luis Leon's right to consular notification, today's opinion should not be read to suggest that remedies are always unavailable for a consular notification violation.

Circumstances warranting a judicial remedy may arise rarely, but the United States Supreme Court has carefully avoided the conclusion that suppression is *never* a remedy for an Article 36 violation. Some situations involve little if any connection between Article 36 and statements obtained by police. But where there is such a connection, suppression serves as an appropriate remedy. For example, there may be defendants who cannot show their confession is involuntary

under *Miranda v. Arizona* (1966) 384 U.S. 436, but would have a claim under the Vienna Convention. (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 393 (dis. opn. of Breyer, J.).) We should also be concerned about confessions coerced, in part, because a law enforcement officer denied a foreign national the right to consular notification. And a consular notification failure may be part of a scheme to deprive the national of any meaningful choice. In such instances, a remedy for the consular notification violation is surely warranted.

Also warranting attention is the telling fact that our own Penal Code requires law enforcement to advise detained foreign nationals of their right to consular notification. (Pen. Code, § 843c, subd. (b).) California's own requirement even goes beyond what the Vienna Convention calls for, by obligating every peace officer to advise a known or suspected foreign national of the right to consular notification upon arrest and booking, or detention for more than two hours. (Pen. Code, § 843c, subd. (a)(1).) California law enforcement agencies must also ensure their policy or procedure and training manuals incorporate language based upon Article 36 that designate procedures for handling the arrest, booking, or detention of a foreign national for more than two hours. (Pen. Code, § 843c, subd. (c).) As is so often the case, law enforcement personnel and the agencies in which they work hold in trust the responsibility of turning our society's legal commitments into action rather than aspiration. Along with our courts, these capable and resourceful agencies share the obligation to ensure the Vienna Convention's worth the paper on which it's printed. (See Harmon, *The Problem of Policing* (2012) 110 Mich. L.Rev. 761, 795.) That courts must also do their part, by fashioning and applying remedies where appropriate, will no doubt help agencies do what they must to

write into their internal cultures these commitments with indelible — not invisible — ink. (See *Sanchez-Llamas*, *supra*, 548 U.S. at p. 349 [explaining that courts exclude the fruits of unreasonable searches and seizures as a means to deter law enforcement agents from disregarding the constraints of the 4th Amend.].)

Yet this case and others like it readily tell the story of how much work remains undone. Consular notification in California often fails to materialize and the duty to notify is routinely honored in the breach. (See *People v. Sanchez* (2019) 7 Cal.5th 14; *Enraca*, *supra*, 53 Cal.4th 735; *In re Martinez* (2009) 46 Cal.4th 945; *People v. Mendoza* (2007) 42 Cal.4th 686; *Case Concerning Avena and Other Mexican Nationals* (*Mexico v. U.S.*) Judgment, 2004 I.C.J. 128 (Mar. 31).) Our vigilance in honoring these legal requirements should not arise solely because we hope Californians detained in foreign countries will be granted their rights to consular notification. At issue are laws ratified by the United States and adopted by the Legislature as part of our Penal Code — ones that convey as clearly as they do consistently the importance of consular notification. (*Medellin v. Texas* (2008) 552 U.S. 491, 505 [explaining that international treaties are domestic law where Congress has enacted implementing statutes or the treaty itself conveys an intention that it be self-executing and is ratified on these terms]; *id.*, at p. 533 (conc. opn. of Stevens, J.) [endorsing the proposition that the Vienna Convention " 'is itself self-executing and judicially enforceable' "]; Pen. Code, § 843c, subd. (b).) If the duty to provide consular notification and contact the relevant consular post when requested is indeed ignored by agents of our state, it ought not to be.

No one should question how complicated it may sometimes prove to calibrate the proper remedy for any procedural violation affecting the criminal justice system. Remedies in virtually any context, no less than in consular notification, often involve fact-specific determinations and intricate balancing of competing concerns. I agree with the majority that we should not suppress Leon's statements to the police here. Nor should we forget that our police often shoulder difficult burdens and resolve competing demands with finite resources as they work to advance public safety. But when our country's given its word, there's no sensible excuse for condoning practices that ignore our obligations under the Vienna Convention or disregard protections guaranteed by California's Penal Code. No competent institution can ignore that all too often these obligations are treated as though they are not worth the paper on which they're printed.

Americans abroad, and not just foreigners on our soil, are protected by the reciprocal logic of our commitment to honor consular notification. I respect our law enforcement officials too much to believe they can't honor our treaty commitments and the laws of this state while also pursuing their investigative mission effectively. Nor can I presume their capacity to execute that mission is so fragile that success depends on permitting consular notification to slip through the cracks. By repairing those cracks, we remind the world that, at least in some corners of the country, our word is our bond.

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Leon
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S143531
**Date Filed:** January 23, 2020
_____

**Court:**  Superior
**County:**  Riverside
**Judge:**  Christian F. Thierbach

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Andrea G. Asaro, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrea Asaro
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607-4139
(510) 267-3300

Kristen Kinnaird Chenelia
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9007